Estate of Charles E. Kimball, American Trust and Banking Company, Executor v. Commissioner.
Estate of Charles E. Kimball v. Commissioner
Docket No. 6337.
United States Tax Court
1946 Tax Ct. Memo LEXIS 33; 5 T.C.M. (CCH) 982; T.C.M. (RIA) 46268; November 19, 1946
*33 Value of stock on date of death of controlling stockholder determined. Albert W. Taber, Esq., Charles L. Claunch, Esq., and Carl A. Swafford, C.P.A., Chattanooga Bank Bldg., Chattanooga 2, Tenn., for the petitioner. Frank M. Thompson, Jr., Esq., and S. Earl Heilman, Esq., for the respondent. ARNOLD Memorandum Findings of Fact and Opinion ARNOLD, Judge: The estate tax return filed by the executor included in the assets of the estate 237 shares of common capital stock of the Chattanooga Welding and Machine Company, Inc., at a value of $100 per share at the date of decedent's death. The respondent valued this stock at $350 per share which determination the executor contests. Other adjustments made by the respondent in the return are not contested. The total deficiency determined amounts to $11,880.45. Findings of Fact Charles E. Kimball died testate, a resident of the City of Chattanooga, Hamilton County, Tenneessee, August 25, 1942. The American Trust & Banking Co., a corporation with principal office in the City of Chattanooga, is the duly appointed, qualified and acting executor under the will. The estate tax return for the estate of the decedent was *34 duly filed with the collector of internal revenue at Nashville, Tennessee. On the return the executor did not elect to have the estate valued as of a date subsequent to the decedent's death. At the time of his death decedent owned 237 out of 239 shares outstanding of the common capital stock of Chattanooga Welding and Machine Co. Inc., a corporation, of Chattanooga, Tennessee. The remaining shares were held by Marcus L. Holt, one share, and Miss Irma Gould, one share. Upon the return the 237 shares owned by the decedent were valued at $100 per share. In 1909 Charles E. Kimball opened a welding shop in Chattanooga, commencing business with about $500 and some tools. The business later became a partnership and upon the death of Kimball's partner in 1934 a corporation was formed. This corporation was dissolved December 31, 1936, and the business was operated by Kimball as an individual proprietorship until December 31, 1938. At that date the books showed the net worth as $23,904.36. The present corporation was formed and took over the operation of the business as of January 1, 1939. The amount of $23,900 was credited to capital stock and $4.36 was set up as due Kimball. The capital *35 stock of 239 shares was issued. Prior to 1935 the predecessor of the present corporation endeavored to manufacture and sell dyeing machines, but could not meet competition and this work was discontinued. In 1938 Kimball engaged in the development of a beverage bottle washing machine which project was continued in 1939, 1940 and 1941 by the present corporation, but was abandoned in 1942. The expenditures on account of the bottle washing machine were charged to a special account on the books in the following amounts: 1938 - $2,959.91; 1939 - $25,568.78; 1940 - $9,376.88; 1941 - $203.26. Upon abandonment the loss of $33,038.83 was completely charged off to profit and loss in 1942. Later, amended returns were made for the prior years wherein the proportionate parts of the expenditures were charged to each year and the income for 1942 was correspondingly increased. Until 1941, the business of the corporation was primarily a local job repair machine shop doing work for various plants in and around Chattanooga. In July 1941 the corporation secured a war contract, this being a sub-contract with General Machinery Co., of Hamilton, Ohio, for the production of low pressure pistons for marine *36 engines. Later it produced machined parts for ship steam engines. In connection with the war contract work the corporation acquired special machinery, some of which duplicated machinery already in the shop and some of which will not be used or usable by the corporation in peacetime work. The war contract work required the corporation to develop line production methods of repeating the same process, whereas the previous work of the corporation had primarily consisted of special jobs, each of a different nature. The war contract work required accurate machining of expensive parts. The equipment added was used machinery and cost some $25,000 in 1941 and some $11,000 in 1942. Some $50,000 was invested in machinery after August 1942 to carry out the war contracts. At the time of Kimball's death the corporation had lost some of its job repair business and was primarily engaged in war production work. No dividends have ever been paid by the corporation on its stock and the stock has never been listed on any exchange nor has there been any trading in it. Prior to August 25, 1942, the officers of the corporation were: Charles E. Kimball, president; Marcus L. Holt, vice-president; and Irma *37 Gould, secretary and treasurer. After Kimball's death the officers were: Marcus L. Holt, president; F. W. Turnbull, vicepresident and secretary; and Irma Gould, treasurer. Irma Gould kept the bank account and looked after the paying of the bills. F. W. Turnbull entered the employ of the corporation in June 1942 as assistant to Marcus L. Holt and has since left the employ of the corporation. Marcus L. Holt was the nephew of Charles E. Kimball and resided with Kimball since Holt was 10 years of age. Holt had three years of training in civil engineering at the Georgia School of Technology. He worked for about four years as a draftsman and on engineering crews in the construction of buildings with Atlanta business organizations. At the age of 25 years he returned to Chatanooga to enter the employ of Kimball. He worked for two or three years in the shop as a helper and then for 12 years served primarily as a salesman and contact man and assisted his uncle and the shop foreman in planning production. In August 1942 Holt's salary was $60 per week. Kimball's salary from 1939 until his death was $5,000 per year. In August 1941 Kimball became ill and was confined to his bed. Holt managed *38 the business, conferring frequently with Kimball concerning it. From about June 1942 Holt was in complete charge of the corporation's affairs. The net income of the corporation for 1942 after taxes, was $19,707.27, after excluding the charge-off for the bottle washer and taking into account the additional taxes that would have been paid on that account the expense of which was mainly attributable to other years. At the time of Kimball's death all of the machinery and equipment of the corporation was encumbered by mortgage liens. The land and buildings occupied by the company were owned by decedent and his wife. Decedent and his wife were guarantors upon all notes given for money borrowed prior to decedent's death by the corporation. Certain of the notes were also secured by insurance on Kimball's life. In May 1942 the corporation obtained a loan from a bank in the amount of $16,183.25. The note was guaranteed by Holt and Mrs. Kimball and was further secured by life insurance on Holt's life. In 1942 and 1943 the corporation suffered a loss on a war contract of $22,500, by reason of the bankruptcy of the prime contractor. Of this loss $15,000 occurred in 1942, the remainder in *39 1943. The loss was ascertained in 1943. The comparative balance sheets of the corporation as of the end of 1941 and 1942 and the comparative profit and loss statements for the years 1939 through 1942 were as follows: CHATTANOOGA WELDING AND MACHINE COMPANY, INC. CHATTANOOGA, TENNESSEE
COMPARATIVE BALANCE SHEETS Dec. 31, 1941
Dec. 31, 1942
CURRENT ASSETS
Cash
$ 202.53
$ 12,252.22
Accounts Receivable
34,477.53
23,285.75
Inventories
8,614.79
31,266.92
Employee Receivables
451.67
1,559.72
Prepaid Expenses
1,070.17
$ 43,746.52
$ 69,434.78
INVESTMENTS - U.S. BONDS
50,000.00
FIXED ASSETS
Machinery and Equipment
46,473.69
56,091.97
Trucks and Cars
3,661.90
3,661.90
Office Equipment
1,367.39
2,501.14
51,502.98
62,255.01
Reserves for Depreciation
22,766.77
29,969.61
28,736.21
32,285.40
OTHER ASSETS
Development of Bottlewasher
33,588.83
Miscellaneous Assets
9,995.08
Total Assets
106,071.56
161,715.26
CURRENT LIABILITIES
Notes Payable, Banks
8,000.00
Notes Payable, Other
11,886.36
4,831.99
Accounts Payable
8,005.94
4,786.01
Customers' Credit Balances
10,275.99
6,138.00
Accrued Taxes
10,500.78
89,345.49
Employee Payables
86.53
C. E. Kimball
10,181.64
58,937.24
105,101.49
STOCKHOLDERS' INTEREST
Capital Stock
23,900.00
23,900.00
Surplus
23,234.32
32,713.77
47,134.32
56,613.77
Total Liabilities
$106,071.56
$161,715.26
*40 CHATTANOOGA WELDING AND MACHINE COMPANY, INC. CHATTANOOGA, TENNESSEE
COMPARATIVE PROFIT AND LOSS SHEETS 1939
1940
1941
1942
SALES
$94,837.95
$102,598.14
$196,552.33
$344,229.66
COST OF SALES
Material
22,864.08
32,230.78
69,455.71
61,192.18
Labor
39,065.64
31,703.63
65,308.38
130,053.95
Shop Expense
4,074.77
11,351.62
20,503.80
13,196.23
Rent to C. E. Kimball (to 8-25-42)
6,600.00
4,800.00
5,000.00
4,800.00
Rent to Sarah P. Kimball
(8-26-42 to 12-31-42)
4,546.09
76,604.49
80,086.03
160,267.89
213,788.45
GROSS PROFIT
18,233.46
22,512.11
36,284.44
130,441.21
SELLING, GENERAL AND ADMINISTRA-
TIVE EXPENSE
Selling
2,115.34
2,063.55
2,594.70
4,614.92
General and Administrative
1,113.54
1,411.43
2,275.54
29,401.98
Salary - C. E. Kimball
5,000.00
5,000.00
5,000.00
3,333.33
Other salaries
3,123.50
3,192.59
6,414.92
20,208.91
11,352.38
11,667.57
16,285.16
57,559.14
OTHER INCOME
Discounts
5.09
243.65
5.09
243.65
OTHER EXPENSE
Bad Debts
371.09
1,144.20
670.01
15,620.08
Interest
441.28
639.96
1,506.56
1,660.67
Discounts
90.19
108.61
Bottlewasher Loss
33,038.83
Other
93.31
812.37
1,874.35
2,378.49
50,319.58
NET PROFIT BEFORE INCOME TAXES
6,073.80
8,970.19
17,620.79
22,806.14
LESS FEDERAL INCOME AND EXCESS
PROFITS TAXES
889.50
1,678.47
6,862.49
13,326.69
NET PROFIT
$ 5,184.30
$ 7,291.72
$ 10,758.30
$ 9,479.45
*41 The number of employees of the corporation in August of each year was as follows: 1939-24; 1940-20; 1941-37; and 1942-88. The value of the stock of the Chattanooga Welding and Machine Company, Inc., on August 25, 1942, was $276 per share. Opinion The question is whether the respondent erred in determining that the value of the 237 shares of stock of the Chattanooga Welding and Machine Company, Inc., on August 25, 1942, was $350 per share. If we find that the respondent erred, we must fix the value. The executor valued the stock at $100 a share in the estate tax return and on the brief contends that the value did not exceed $150 a share. The stock was the entire amount outstanding with the exception of two shares. There have been no market transactions in the stock. The applicable regulations provide that as to stock where actual sales and bid and asked prices are not available "the value is to be arrived at * * * upon the basis of the company's net worth, earning power, dividend-paying capacity, and all other relevant factors having a bearing upon the value of the stock." (Regulations 105, section 81.10(c)). The parties recognize that the value of the stock is to be determined *42 from the conditions existing on August 25, 1942, and that subsequent events may be considered only if they were reasonably foreseeable on that date. The executor introduced expert testimony to show that the book value of the stock was not in excess of $150 per share. One witness was a certified public accountant who had put the corporation's books in order in 1942 and had continually since been its auditor. He valued the stock according to book value at the end of 1941, plus a pro rata share of net earnings for 1942, less 50 per cent of the book value of fixed assets at the end of 1942 to allow for the special character of the machinery acquired for war production which would be excess machinery to peacetime needs. He reached a valuation of $146.63 per share. Another witness, trust officer of the executor, recommended evaluating the stock according to book value, less anticipated taxes, less an allowance for renegotiation of war contracts, less an additional allowance for depreciation in the value of the machinery. Using book value at the end of 1942, his computation reached a value of $150 a share. Holt suggested book value at the end of 1942, less 50 per cent of the book value *43 of machinery as additional depreciation, and reached a valuation of $155.10 per share. All these computations involved a reduction in the value of machinery in addition to normal depreciation. This reduction was explained by the witnesses on the ground that some of the machinery was usable only on war contract work and would therefore have only a limited period of productive use and would have to be sold at a loss in a low market later. However, in August 1942 machinery was difficult to procure and commanded high prices. The corporation paid $25,000 in 1941 and $11,000 in 1942 for used machinery to carry out its war contracts and we could not say that half this value immediately disappeared. Cost is cogent evidence of value. . The machinery was carried on the books at depreciated values and there appears no justification for a further reduction in these values. The respondent, although preferring to value the stock by capitalization of earnings, also makes a calculation based upon book value according to the balance sheet as of the end of 1942 and finds the value to be $241.06 per share. This computation allows only *44 normal depreciation on machinery. Respondent would also reduce from $5,000 to $2,000 the annual rent paid for the premises owned by Kimball and his wife, and occupied by the corporation, add the difference to surplus, and thereby reach a book value of $311.13 per share as of the end of 1942. The respondent says a reasonable addition for good will would raise the valuation to $350. Book value is but one of the factors to be considered, . There are a number of other elements in this case to be taken into consideration, among which are the facts that the stock is the controlling stock of the corporation, that the death of the founder and financial backer would affect future operations, that the corporation took a loss in 1942 on a war contract, that it occupied rented premises and might have to pay exorbitant rent for space, that all its property was mortgaged and its machinery was old and wearing out under overtime use, that Holt's ability to operate the business successfully was yet to be proved, that the business of many years' standing may have had some value in good will which was not shown on the books, that the fiscal position *45 of the corporation was definitely bad at the end of 1941, that the earnings record was good and showed greater profits in 1942 than in any prior year and that there was the possibility of even greater profits from the war contracts. The respondent relies principally upon the method of capitalizing earnings to ascertain the value of the stock and submits computations reaching valuations of from $329.50 to $509.30, depending upon the capitalization rate and the period of earnings taken as representative. The use of this method presupposes that past earnings are a reliable index of the prospective future earnings for a sufficient period to assure a stabilized return on the investment. There are a number of factors in this case which indicate that on the critical date the past earnings were not a dependable basis for the prediction of the future earnings of this corporation. The business was under new and comparatively untried management. The war contract work had largely superseded the former business. The new work involved operations new to the corporation, its managers and its employees. Whether the work would prove profitable or result in loss was unpredictable in August 1942. In *46 fact a partial loss was sustained in 1942 and 1943 through the bankruptcy of a prime contractor. If profits resulted from the war contract work, it could not be foreseen how long these profits could be expected or to what extent they would be reduced by war taxes or whether they would be sufficient to enable the corporation to recover the additional investment in machinery. Nor could it be foreseen what difficulties would arise upon reconversion to a peacetime basis, or what sources of future business might be available after the war. We think the respondent has given undue weight to the record of earnings when the other facts in this case are considered, particularly since it could be foreseen in August 1942 that the war earnings would not last and that the necessary reconversion to a peacetime business would be full of hazard. While earning power is an important factor, other facts must be considered in the evaluation. . However, the earnings record has been given its proper weight in arriving at our conclusion. A few other points merit comment. While there are some statements in the record that Holt *47 was rash and impetuous, on the other hand he had devoted many years to working in the business, had been actively in charge since his uncle became bedridden, and had the benefit of continual consultation with his uncle for a number of months before the latter became unable to advise him further. He was in active charge during the conversion to war work and had a hand in solving the problems arising in that process. He engaged an accountant in August 1942 to put the books in order and establish a cost accounting system. The good will built up over many years in which the business had been operated would be substantially diminished by the death of the founder and the conversion to war work. While the fiscal position of the corporation was bad at the end of 1941, according to the balance sheet, it was greatly improved at the end of 1942 and must have shown substantial improvement by August of that year. We have considered the opinions of the witnesses, the balance sheets and earnings record, the history of the business both prior and subsequent to the forming of the present corporation, the future prospects of the corporation as they appeared in August 1942 and all other revelant facts *48 and circumstances of record, and have arrived at the conclusion that the fair market value of the stock on August 25, 1942, was $276 per share. Decision will be entered under Rule 50.